**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| United States of America, | Crim. No. 10-339 (PJS/JJK) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| (6) Cruz Rosales, | |
| Defendant. | |

Jeffrey S. Paulsen, Esq., Assistant United States Attorney, counsel for Plaintiff.

Michael C. Hager, Esq., Hager Law Office, counsel for Defendant Rosales.

JEFFREY J. KEYES, United States Magistrate Judge

    This matter is before the Court on Defendant Cruz Rosales's Motion to Suppress Physical Evidence (Doc. No. 204) and Motion to Suppress Statements (Doc. No. 203). This Court held an evidentiary hearing on the motions and received testimony from the following Government witnesses: DEA task force agent Detective Jeffrey M. Miller and St. Paul Police Officer Pat Dale. The matter was referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. Loc. R. 72.1. For the reasons set forth below, this Court recommends that Defendant's motions be denied.

## BACKGROUND

    Defendant Rosales and six Co-Defendants were indicted on charges of conspiracy to distribute methamphetamine, cocaine, and marijuana in violation of

21 U.S.C. §§ 846 and 841(b)(1)(A).  (Doc. Nos. 7, 62.)   Defendant Rosales was also charged with one count of distribution of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B).  (*Id.*)

Over the last several years, the Government has been investigating a drug trafficking organization led by Noe Alamos-Pantoja, a Co-Defendant in this matter.[1]   Sometime before June 7, 2010, Detective Miller and other officers learned that individuals associated with a Mexican drug supplier and fugitive, Gustavo Valvodinos, were in Minnesota to collect on a drug debt owed to Valvodinos and his organization.  Detective Miller also testified that they learned that on June 7, 2010, in payment of a past drug debt to Valvodinos, a cooperating informant was going to give up to Valvodinos the title to his vehicle.  With the agents nearby, the cooperating informant met with four individuals who were in a black Hummer vehicle and then gave one of them, a woman, the title to settle the drug debt.   The informant then sent a text message to the agents confirming the transaction.   Surveillance officers then followed the Hummer and later observed four individuals leave the Hummer and enter the Department of Motor Vehicles in St. Paul.  The surveillance officers concluded that they were going into the DMV to transfer the title.  After the four individuals returned to the Hummer, the officers contacted a St. Paul uniformed police officer in a marked squad car, and directed him to perform a traffic stop and obtain identifications for

---

[1]   The following summary is based on the testimony of Officers Jeffrey Miller and Pat Dale at the evidentiary hearing and the hearing exhibits.

the Hummer's occupants. Officer Pat Dale responded to the call, stopped the vehicle and obtained identification for its occupants, including Defendant Rosales. Neither the car nor its occupants were searched and no one was arrested.

Then, as a result of the federal wiretap monitoring, Detective Miller and other agents learned that a pound of methamphetamine would be delivered to Noe Alamos-Pantoja on July 31, 2010. A surveillance team following Alamos Pantoja observed two Hispanic men—both wearing red soccer jerseys—meet with Alamos-Pantoja, transfer a package to him, and then leave in a Toyota. Immediately after this transaction, Alamos-Pantoja texted his drug source as follows: "It's done buddy they gave me the work." Detective Miller testified that "work" is common street jargon for drugs. Surveillance officers followed the two men in red jerseys after they drove away from Alamos Pantoja and headed to the Minneapolis/St. Paul airport. The two men got out of the Toyota in the parking ramp and entered the airport. The surveillance officers alerted airport police and asked them to identify the two Hispanic men in red jerseys. The airport personnel identified the two Hispanic males as Defendant Cruz Rosales and Co-Defendant Benjamin Perez. As Rosales and Perez went through TSA security in preparation for their flight to Portland, Oregon, the airport personnel discovered approximately $10,000 in cash on each person. Following the discovery of $10,000 in cash on his person, Rosales spoke to an investigator and stated that the money was going to be used for the purchase of vehicles in Oregon.

Defendant Rosales now seeks to suppress evidence obtained during the June 7, 2010 and July 31, 2010 stops as well as statements he provided to the airport officers during the July 31, 2010 stop.  The Government opposes these motions.  This Court concludes that Defendant's motions to suppress evidence and statements should be denied.

## ANALYSIS

I.  **Defendant Rosales's Motion to Suppress Evidence**

   A.  **The June 7, 2010 *Terry* Stop and Identification**

"[A] police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Terry v. Ohio*, 392 U.S. 1, 30 (1968); *see also United States v. Bell*, 480 F.3d 860, 863 (8th Cir. 2007).  The officer must have "a particularized and objective basis" for suspecting criminal activity.  *Bell*, 480 F.3d at 863 (quoting *United States v. Jacobsen*, 391 F.3d 904, 906 (8th Cir. 2004)).  Such suspicion may not be based on an inchoate or unparticularized suspicion or hunch, but must be grounded on facts that, in light of the officer's experience, support specific, reasonable inferences that justify the intrusion. *Terry*, 392 U.S. at 22.  "Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances." *Bell*, 480 F.3d at 863 (quoting *United States v. Maltais*, 403 F.3d 550, 554 (8th Cir. 2005)).  When a reasonable and articulable suspicion exists,

4

the detaining officer may conduct an investigative stop of the suspect in order to confirm or dispel his or her suspicion. *United States v. Johnson*, 64 F.3d 1120, 1124 (8th Cir. 1995).

Officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Ortiz-Monroy*, 332 F.3d 525, 529 (8th Cir. 2003) (quotations omitted). Therefore, a stop may be justified even where no traffic violation has occurred. *United States v. Mora-Higuera*, 269 F.3d 905, 909 (8th Cir. 2001). And even innocent actions may give rise to reasonable suspicion if they warrant consideration under the totality of the circumstances. *See United States v. Condelee*, 915 F.2d 1206, 1209 (8th Cir. 1990) (stating that "there could be 'circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot'") (quoting *Reid v. Georgia*, 448 U.S. 438, 441 (1980)).

Further, courts have used the "'collective knowledge' theory to impute the knowledge of one officer to others." *United States v. Terry*, 400 F.3d 575, 581 (8th Cir. 2005) (applying collective knowledge doctrine to uphold seizure of ammunition by officer with no personal knowledge that defendant was subject to protective order restricting him from possessing ammunition). As such, "the knowledge of one officer is the knowledge of all and [ ] in the operation of an investigative or police agency the collective knowledge and the available objective facts are the criteria to be used in assessing probable cause." *U.S. v.*

*Stratton*, 453 F.2d 36, 37 (8th Cir. 1972).   Further, the Supreme Court has noted that "effective law enforcement cannot be conducted unless police officers can act on *directions* and information transmitted by one officer to another." *United States v. Hensley*, 469 U.S. 221, 231 (1985) (quotations omitted) (emphasis added).

Here, the informant's information, corroborated by police surveillance, and the collective knowledge of Detective Miller and the teams of investigation and surveillance officers provided sufficient grounds for Officer Pat Dale to stop Defendant Rosales and ask for his identification under *Terry*, 392 U.S. at 30. The informant in this case was known to law enforcement and had provided reliable information in the past.   The informant's facts regarding the title handover to the Hummer's occupant were corroborated when surveillance officers saw the four people enter the DMV building and return to their vehicle a short time later.   At that point, the surveillance officers had, at a minimum, a reasonable and articulable suspicion to conduct an investigative stop and identify the occupants of the vehicle.  But they did not wish to compromise the ongoing investigation—and expose their under-cover operations—by stopping Defendant in their unmarked cars.  So they called a uniformed officer in a marked squad to perform the traffic stop instead.  Officer Pat Dale responded to the call and was directed to stop the black Hummer and get the occupants' identifications, which he did.   That Officer Dale *himself* was unaware of the reasons underlying the stop and was not informed about the Government's investigation of Defendant is

6

irrelevant because he was acting under the direction of the officers whose knowledge justified the stop and identification. *See Hensley,* 469 U.S. at 231 ("[E]"ffective law enforcement cannot be conducted unless police officers can act on *directions* and information transmitted by one officer to another.") (emphasis added).

### B.     The July 31, 2010 Airport Stop and Identification

As with the June 7, 2010 stop, this Court finds no constitutional infirmities with the July 31, 2010 airport personnel's stop and identification of Defendant Rosales.

"It is well established that the burdens of production and persuasion generally rest upon the movant in a suppression hearing." *United States v. Starks*, 193 F.R.D. 624, 629 (D. Minn. 2000) (quoting *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977), *cert. denied*, 431 U.S. 932, 97 (1977)); *see also United States v. Phillips*, 540 F.2d 319, 325 (8th Cir. 1976) (stating that the ultimate burden of proof is on the defendant who seeks to suppress evidence). "At a minimum, it is defendant's burden to come forth with some evidence and argument to support his position that evidence . . . should be suppressed." *United States v. Rosetter*, Crim. No. 10-83 (JNE/JSM), 2010 WL 5184991, at *23 (D. Minn. Oct. 1, 2010) (citing *Starks*, 193 F.R.D. at 629) ("[E]ven in those circumstances where the Government has the ultimate burden of persuasion, Defendant has the initial burden of making a prima facie showing of illegality."). And "[f]ailure to provide the Court with any support for the motion

7

is a sufficient basis for denial of the motion." *Rosetter*, 2010 WL 5184991, at *23. Defendant Rosales has not met his burden.

As discussed above, "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Terry*, 392 U.S. at 30; *see also Bell*, 480 F.3d at 863. An officer may conduct a *Terry* investigative stop as long as he has "a particularized and objective basis" for suspecting criminal activity. *Bell*, 480 F.3d at 863 (quoting *Jacobsen*, 391 F.3d at 906).

Here, the officers had, at a minimum, a reasonable and articulable suspicion to stop and identify Defendant Rosales at the Minneapolis/St. Paul airport on July 31, 2010. The investigation officers had reasonable suspicion to believe that he had just engaged in criminal activity by delivering a large quantity of drugs and some cash to Alamos-Pantoja. As such, they were justified in alerting the airport police and directing them to stop and identify Defendant Rosales under the collective knowledge doctrine. *See Hensley,* 469 U.S. at 231 ("[E]"ffective law enforcement cannot be conducted unless police officers can act on *directions* and information transmitted by one officer to another.") (emphasis added).

    **C.**    **Defendant's Inspection and Discovery of $10,000**

By going through security at MSP, Defendant Rosales voluntarily subjected himself and his belongings to a permissible administrative search. *See*

*U.S. v. Aukai*, 497 F.3d 955, 960 (9th Cir. 2007) (en banc) ("We have held that airport screening searches, like the one at issue here, are constitutionally reasonable administrative searches because they are conducted as part of a general regulatory scheme in furtherance of an administrative purpose, namely, to prevent the carrying of weapons or explosives aboard aircraft, and thereby to prevent hijackings") (internal quotations omitted); *United States v. Hartwell*, 436 F.3d 174, 178 (3d Cir. 2006) (discussing the validity of various types of airport checkpoint and administrative searches).  And in light of the evidence of Defendant Rosales's involvement in the drug deal before he went directly to the airport, the officers likely had probable cause to direct the airport police to arrest Defendant, but chose not to do so to avoid compromising the ongoing investigation of other co-conspirators.  In sum, Defendant has not provided any evidence to establish that suppression of money is warranted.  Accordingly, this Court recommends that Defendant's motion to suppress the discovery of $10,000 be denied.

II.   **Defendant Rosales's Motion to Suppress Statements**

Defendant brought a motion to suppress his statements to airport personnel during the June 31, 2010 stop at the Minneapolis/St. Paul airport.  At the hearing and in its written submissions, the Government made clear that it does not intend to use Defendant's statements to airport personnel in its case-in-chief, but reserves the right to use them for impeachment or rebuttal.

Nonetheless, Defendant's counsel declined to withdraw his suppression motion relating to statements.

Because the Government already promised not to use Defendant's statements to airport investigator in its case-in-chief, Defendant's motion to suppress statements should be denied as moot. The Government has reserved the right to use the statements for impeachment purposes, but this does not alter the outcome of Defendant's motion. Even statements that are inadmissible in a prosecution's case-in-chief for fear of violating a defendant's Fifth Amendment rights can be admissible for impeachment purposes. *Harris v. New York*, 401 U.S. 222 (1971); *see also Krimmel v. Hopkins*, 44 F.3d 704, 709 (8th Cir. 1995) (holding that the Government can use statements that are inadmissible in its case-in-chief to impeach a defendant's credibility). This is because suppressing illegally obtained statements for the Government's case-in-chief fulfills the exclusionary rule's purpose. *Harris*, 401 U.S. at 224, 225. If a defendant takes the stand and places his credibility at issue, the Government may use his statements—even those statements obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966)—for impeachment purposes as long as he made them voluntarily.[2] *Id.* The admissibility of rebuttal evidence, however, is a matter left to the sound discretion of the trial judge. *United States v. Armstrong*, 462 F.2d 408, 411 (8th Cir. 1972). Accordingly, whether any of Defendant's

---

[2] Defendant has not presented any evidence to suggest that his statements to the airport police were involuntary.

10

statements are admissible as impeachment or rebuttal evidence is a determination best left for the trial judge, if the need for such a determination arises.

## RECOMMENDATION

Based on the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1. Defendant Rosales's Motion to Suppress Physical Evidence (Doc. No. 204), be **DENIED**; and

2. Defendant Rosales's Motion to Suppress Statements (Doc. No. 203), be **DENIED AS MOOT**.

Date: June 9, 2011

*s/Jeffrey J. Keyes*
JEFFREY J. KEYES
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **June 16, 2011**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within **seven** days after service thereof.  All briefs filed under this rule shall be limited to 3500 words.  A judge shall make a de novo determination of those portions of the Report to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and file a complete transcript of the hearing within **ten days** of receipt of the Report.