UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,                     Case No. 10-CR-0339 (PJS/JJK)

                    Plaintiff,
                                                          ORDER
v.

CRUZ ROSALES (6),

                    Defendant.

---

Jeffrey S. Paulsen, UNITED STATES ATTORNEY'S OFFICE, for plaintiff.

Michael C. Hager, HAGER LAW OFFICE, for defendant.

Defendant Cruz Rosales is charged with conspiring to distribute methamphetamine, cocaine, and marijuana in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A).  He is also charged with aiding and abetting the distribution of methamphetamine in violation of 21 U.S.C. § 841(b)(1)(A) and 18 U.S.C. § 2.  Magistrate Judge Jeffrey J. Keyes has issued three Reports and Recommendations ("R&Rs") concerning a number of Rosales's pretrial motions. *See* Docket Nos. 244, 261, 262.  In the R&Rs, Judge Keyes recommends: (1) denying Rosales's motion to suppress evidence obtained by means of electronic surveillance [Docket No. 244]; (2) denying Rosales's motion to sever [Docket No. 261]; and (3) denying Rosales's motion to suppress physical evidence and denying as moot Rosales's motion to suppress statements [Docket No. 262].

This matter is before the Court on Rosales's objections to the R&Rs.  The Court has conducted a de novo review.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3).  Based on that review, the Court adopts two of the R&Rs [Docket Nos. 244 and 261] and denies Rosales's motions regarding electronic surveillance and severance.  The Court also adopts the third R&R

[Docket No. 262] insofar as it recommends denying Rosales's motion to suppress statements as moot.  With respect to Rosales's motion to suppress physical evidence, however, the Court will reopen the record and hold an evidentiary hearing.

### A.  Motion to Exclude Electronic Surveillance Evidence

On March 24, 2011, Judge Keyes issued an R&R addressing an identical motion regarding electronic surveillance brought by one of Rosales's codefendants.  *See* Docket No. 167.[1]  In the March 24 R&R, Judge Keyes thoroughly reviewed the record concerning the authorization of electronic surveillance in this case and concluded both that the authorization was supported by probable cause and that the authorization was proper under 18 U.S.C. § 2518, which limits the use of electronic surveillance and sets forth standards that the government must meet in order to conduct such surveillance.  The Court adopted that R&R on April 11, 2011.  *See* Docket No. 185.  Having reviewed the record de novo for purposes of Rosales's motion, the Court again concludes that the authorization was proper for the reasons set forth in Judge Keyes's March 24 R&R.  Rosales's motion to suppress evidence obtained by means of electronic surveillance is therefore denied.

### B.  Motion to Sever

Rosales argues that severance is necessary because a joint trial would deprive him of the ability to call his codefendants as witnesses.  But "[i]t is not enough 'for a defendant to claim . . . that he needed a separate trial in order to call a co-defendant as a witness.  He must show that it is likely his codefendant would have testified and that the testimony would have been exculpatory.'"  *United States v. Crumley*, 528 F.3d 1053, 1063-64 (8th Cir. 2008) (quoting

---

[1]Judge Keyes signed the R&R on March 23.

*United States v. Mickelson*, 378 F.3d 810, 818 (8th Cir. 2004)).  Rosales has not met this standard; instead, he offers only speculation that one or more of his codefendants might testify, and that, if they testify, their testimony might be exculpatory in some unspecified way.

Rosales also argues that severance is necessary because he and his codefendants will present mutually antagonistic defenses.  As a general matter, "'[t]he mere fact that one defendant tries to shift blame to another defendant does not mandate separate trials, as a codefendant frequently attempts to point the finger, to shift the blame, or to save himself at the expense of the other.'"  *Crumley*, 528 F.3d at 1063 (quoting *United States v. Flores*, 362 F.3d 1030, 1039-40 (8th Cir. 2004)).  Severance may be necessary, however, where codefendants present mutually antagonistic defenses.  *United States v. Payton*, 636 F.3d 1027, 1037 (8th Cir. 2011).  But the mere fact that codefendants offer conflicting defenses does not require severance; instead, severance is required "'only when there is a danger that the jury will unjustifiably infer that *this conflict alone demonstrates that both are guilty*.'"  *Id.* (quoting *United States v. Sandstrom*, 594 F.3d 634, 644 (8th Cir. 2010)).  The defendant bears a "heavy" burden to make this showing.  *Id.* (citation and quotations omitted).  Rosales has not come close to meeting this burden.  He does not identify his own defense or explain how it conflicts with the defenses of his codefendants, and he offers only speculation that his codefendants might take the position that he acted on his own.

Finally, Rosales argues that severance is required because the evidence shows, at most, that he was part of a separate, smaller conspiracy involving his codefendant Benjamin Perez, and there is insufficient evidence that he was part of the larger conspiracy alleged in the indictment. The Court disagrees.  As discussed below, there is evidence that Rosales — along with his

codefendants Noe Alamos Pantoja ("Alamos") and Giesy Sanchez — assisted in the collection of a drug debt owed to one of the alleged suppliers of the conspiracy.  There is also evidence that Rosales (along with Perez) delivered drugs and money to Pantoja on a separate occasion.  This is sufficient evidence of Rosales's participation in the larger conspiracy, and Rosales is properly joined under Fed. R. Crim. P. 8(b).  Rosales's motion to sever is denied.

### C.  Motions to Suppress Physical Evidence and Statements

Rosales's suppression motions relate to evidence gathered at a June 7, 2010 traffic stop in St. Paul and a July 31, 2010 search and seizure at the Minneapolis/St. Paul International Airport. The Court discusses each incident in turn.

### 1.  June 7, 2010 Traffic Stop

On June 7, agents were surveilling a cooperating informant who was supposed to be paying off a drug debt owed to a man named Gustavo Valdovinos.  Hr'g Tr. 7-9, May 3, 2011 [Docket No. 253].  Valdovinos was one of the sources of drugs for the alleged conspiracy.  Hr'g Tr. 8.  (He is currently a fugitive in Mexico.)  The informant was supposed to turn over the title to a sport-utility vehicle to associates of Valdovinos as payment for the debt.  Hr'g Tr. 8-9.

The agents saw Alamos and Sanchez — who were both known to be members of the conspiracy — pick up the informant, drive him to his parent's house to pick up the vehicle title, and then drive him to a restaurant in Minneapolis.  Hr'g Tr. 10-11.  A black Hummer with Oregon license plates then arrived at the restaurant.  Hr'g Tr. 11.  Just before the Hummer appeared, the informant sent a text message to the agents telling them to watch for a black Hummer.  Hr'g Tr. 11.  The agents saw the Hummer arrive and then leave a few minutes later, but were unable to see the meeting take place.  Hr'g Tr. 11-12.  After the Hummer left, the

informant sent a text message to the agents stating that he had given the vehicle title to the people in the Hummer.  Hr'g Tr. 12.  (Although the record is unclear, the parties agree that the title was given to a woman in the Hummer.)  The Hummer then went directly to the Department of Motor Vehicles ("DMV") in St. Paul.  Hr'g Tr. 12.  The agents observed four people in the Hummer; when the Hummer arrived at DMV, the agents saw all four people go into the DMV and come back out again.  Hr'g Tr. 12, 28.  The agents contacted a St. Paul police officer, who arranged for a uniformed officer to stop the Hummer and identify the four occupants, one of whom was Rosales.  Hr'g Tr. 12-14.

Rosales first argues that, because the informant did not hand the title to *him*, the agents had no basis to suspect him of a crime.  The Court disagrees.  Although the informant did not hand the title directly to Rosales, it is reasonable to infer that Rosales was present to help enforce the collection of the drug debt — which, as the government notes, is an inherently coercive activity.  In addition, the fact that all four occupants of the Hummer (including Rosales) went into the DMV further indicates that they were acting in concert.

Rosales next argues that the St. Paul officer who stopped the Hummer lacked any legal basis to do so.  Rosales does not dispute that, as a general matter, the collective knowledge of law-enforcement agents involved in an investigation may be imputed to an officer who makes a stop.  But he argues that there must be "some degree of communication" between the investigating agents and the officer who made the stop.  *See United States v. Terry*, 400 F.3d 575, 581 (8th Cir. 2005) (citation and quotations omitted).  Rosales argues that the amount of communication in this case — which was nothing beyond a bare direction to stop the vehicle and identify the occupants — is insufficient to meet this standard.  The Court disagrees.

The communication requirement "distinguishes officers functioning as a team from officers acting as independent actors who merely happen to be investigating the same subject." *Terry*, 400 F.3d at 581.  Here, the St. Paul officer who stopped the Hummer was acting solely at the request and direction of agents who had personal knowledge sufficient to justify the stop. Under these circumstances, the St. Paul officer was functioning as part of the investigative team; he was not in any sense an independent actor.  It is therefore appropriate to impute the agents' knowledge to the St. Paul officer.  *Cf. United States v. Gillette*, 245 F.3d 1032, 1034 (8th Cir. 2001) (imputing knowledge of consent to search to an officer who, in response to a call for backup, "simply arrived on the scene and immediately began to search vehicles"); *see also United States v. Hensley*, 469 U.S. 221, 232 (1985) ("We conclude that, if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information.") (citations omitted); *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 568 (1971) ("We do not, of course, question that the Laramie police were entitled to act on the strength of the radio bulletin.").[2]

---

[2]Rosales cites *Whiteley* for the proposition that, when an arresting officer relies on a radio bulletin to effect an arrest, the arresting officer must himself possess some information justifying the arrest.  But in *Whiteley*, the underlying basis for the arrest was an informant's tip.  *Whiteley*, 401 U.S. at 565.  The Supreme Court held that the tip was not sufficient to provide probable cause because *no one* — including the arresting officer — possessed any information corroborating the tip.  *Id.* at 567-68.  Nowhere did the Supreme Court suggest that the arresting officer *himself* had to possess the corroborating information; to the contrary, the Supreme Court specifically stated that "the Laramie police were entitled to act on the strength of the radio bulletin."  *Id.* at 568.  The problem was that, even taking all the officers' collective knowledge into account, there was no probable cause to arrest the petitioner.

Rosales also argues that there is no evidence corroborating the confidential informant's information.  But the informant's information was corroborated in several ways:  He told the agents that he owed a drug debt to a particular drug supplier, and individuals associated with that drug supplier (Pantoja and Sanchez) showed up at the meeting; he told the agents to watch for a black Hummer, and a black Hummer appeared at the meeting; and immediately after he gave the vehicle title to a woman in the Hummer, the Hummer drove directly to the DMV.  The Court therefore has no trouble concluding that there was reasonable suspicion to stop the Hummer in order to identify the occupants.  *See Hensley*, 469 U.S. at 226 ("law enforcement agents may briefly stop a moving automobile to investigate a reasonable suspicion that its occupants are involved in criminal activity").

### 2.  July 31, 2010 Search and Seizure

On July 30, agents intercepted text messages from Valdovinos to Pantoja asking Pantoja to pick up drugs and money from someone named "Meno."  Hr'g Tr. 14.  The next day (July 31), Pantoja sent a text message to Valdovinos stating that he was on his way to meet Meno's people. Hr'g Tr. 15.  Shortly before the meeting, Valdovinos sent Pantoja a text message saying "Get all of it.  Let me know how much paper they gave you and material."  Hr'g Tr. 18.  "Paper" and "material" are code for money and drugs, respectively.  Hr'g Tr. 18.

Agents conducting surveillance saw Pantoja and Sanchez drive to a Wal-Mart in Vadnais Heights.  Hr'g Tr. 15.  While still in their car, Pantoja and Sanchez met with two Hispanic males wearing red soccer jerseys and blue baseball caps; the two Hispanic males — who turned out to be Rosales and Perez — were in a Toyota pickup truck.  Hr'g Tr. 15, 19.  After a brief exchange, the vehicles went their separate ways.  Hr'g Tr. 16.  Surveillance officers followed Rosales and

Perez from their meeting with Pantoja and Sanchez to the Minneapolis-St. Paul International Airport.  Hr'g Tr. 16, 19.

While following Rosales and Perez, agents continued to intercept text messages between Pantoja and Valdovinos.  Hr'g Tr. 16.  Among other things, Pantoja told Valdovinos that "[i]t's done, buddy.  They gave me the work."  Hr'g Tr. 17.  "Work" is code for drugs.  Hr'g Tr. 18. There were additional coded messages concerning how much drugs and money Pantoja had received.  Hr'g Tr. 18-19.  Based on the messages, the agents believed that Rosales and Perez had given $5,500 and 28 ounces of methamphetamine to Pantoja.  Hr'g Tr. 22-23.  The agents contacted the Airport Police Department and Dispatch, gave them a description of the two men in the Toyota pickup truck, and asked them to identify the men — who, as noted, turned out to be Rosales and Perez.  Hr'g Tr. 20.  Airport security personnel also found approximately $10,000 in cash on each of the men.[3]  Hr'g Tr. 21.

The Court agrees with the government that the agents who surveilled the transaction had probable cause to arrest Rosales and could have searched him incident to that arrest.  And, as discussed above, the knowledge that the surveilling agents had may be imputed to the officers who actually conducted the search and seizure so long as there was "some degree of communication" between the agents and the officers.  *See Terry*, 400 F.3d at 581 (citation and quotations omitted).

---

[3]The airport officers also interviewed Rosales and Perez; the government has agreed not to use Rosales's statements in its case in chief, and the Court therefore agrees that Rosales's motion to suppress these statements should be denied as moot.

The record is unclear, however, concerning who actually conducted the search and seizure and what was communicated to whom.[4]  Likewise, the record does not indicate where or how the cash was found.  Without knowing what, if anything, was communicated to the officers who actually conducted the search and seizure, the Court cannot determine whether the surveilling agents' knowledge should be imputed to them.  Indeed, there is some suggestion in the record that agents from the Transportation Security Administration ("TSA") had their own reasons for investigating Rosales and Perez and that it was the TSA agents who found the cash.  Hr'g Tr. 31-32.  Given the state of the record, the Court cannot rule out the possibility that the TSA agents were "independent actors who merely happen[ed] to be investigating the same subject" and that it would be improper to impute the surveilling officers' knowledge to them.  *Terry*, 400 F.3d at 581; Hr'g Tr. 25 ("I was in contact with the airport police dispatch.  I know that one or two of the Hennepin County deputies actually went into the airport.  I don't know of any contact that they had with the TSA agents.").[5]

---

[4]The lack of evidence in the record concerning the events at the airport is apparently the result of an understanding — or, more accurately, a misunderstanding — between the government and defense counsel concerning the scope of the parties' dispute.  The Court appreciates the parties' attempt to simplify the issues, but it now appears that further factual development is necessary.

[5]There is a further complication:  According to the surveilling agent's testimony, he gave airport police a description of Rosales and Perez and asked the police to *identify* the two men.  Hr'g Tr. 20.  It is not clear to the Court that an officer with no other knowledge or connection to the investigation who was merely given a description and a request for identification could then constitutionally *search* the two men.  *Cf. Hensley*, 469 U.S. at 234-35 (upholding a brief detention because "[a]n objective reading of the entire flyer would lead an experienced officer to conclude that Thomas Hensley was at least wanted for questioning and investigation" and "the stop and detention that occurred were in fact *no more intrusive than would have been permitted an experienced officer on an objective reading of the flyer*" (emphasis added)).

Even without imputing the surveilling agents' knowledge to the TSA agents, it is possible that there are independent reasons that would justify the TSA agents' search. But any such reasons are not in the record. Likewise, it is true that airport security personnel may properly conduct suspicionless screening searches that are "conducted as part of a general regulatory scheme in furtherance of an administrative purpose, namely, to prevent the carrying of weapons or explosives aboard aircraft . . . ." *United States v. Aukai*, 497 F.3d 955, 960 (9th Cir. 2007) (en banc) (citation and quotations omitted). But it is not at all clear that the cash was found pursuant to such a search. Moreover, "the scope of such searches is not limitless." *Id.* at 962. Without any information about the search, the Court is unable to say that the scope of the search was proper.

The Court will therefore hold an evidentiary hearing so that the parties can submit evidence concerning the events at the airport, the communications between the surveilling officers and the agents who actually conducted the search, the details of the search and seizure, and any independent basis that the airport agents may have had for the search and seizure.

ORDER

Based on all of the files, records, and proceedings herein, the Court ADOPTS the May 26, 2011 R&R [Docket No. 244] and the June 9, 2011 R&R concerning Rosales's motion to sever [Docket No. 261]. The Court ADOPTS IN PART the June 9, 2011 R&R concerning Rosales's suppression motions [Docket No. 262] insofar as the R&R recommends denying Rosales's motion to suppress statements as moot. Accordingly, IT IS HEREBY ORDERED THAT:

1.      Rosales's motion to suppress evidence obtained by means of electronic
        surveillance [Docket No. 216] is DENIED.

2.      Rosales's motion to sever [Docket No. 199] is DENIED.

3.      Rosales's motion to suppress statements [Docket No. 203] is DENIED AS
        MOOT.

4.      The parties are directed to contact the undersigned's chambers to schedule an
        evidentiary hearing on Rosales's motion to suppress physical evidence [Docket
        No. 204].

Dated: August  16 , 2011                     s/Patrick J. Schiltz_____
                                             Patrick J. Schiltz
                                             United States District Judge